## Case No. 13,460.

STINSON v. WYMAN et al.

[2 Ware (Dav. 172) 176.] [1]

District Court, D. Maine. Dec. Term, 1841.

SHIPPING—LIABILITY OF OWNER—EX CONTRACTU—EX DELICTO—ABANDONMENT—MAINE STATUTE.

1. By the common law, the owners are responsible for all the obligations contracted by the master, whether arising ex contractu or ex delicto, within the scope of his authority as master, to their full extent.

[Cited in Thompson v. Hermann, 3 N. W. 583, 47 Wis. 610.]

2. But, by the general maritime law of Europe, their liability for his obligations ex delicto is limited to the amount of their interest in the ship and cargo, and by abandoning these they are discharged from all personal responsibility.

3. Rev. St. Me. c. 47, § 8 (and Act 1821, c. 14, § 8), limit the responsibility of the owners "for any embezzlement, loss, or destruction, by the master or mariners, of any goods or merchandise or any property put on board a ship or vessel," to the amount of their interest in the ship and freight. The reason and policy of the act extend the exemption so as to include losses occasioned by the negligence of the master or crew, as well as those directly caused by their wrongful act. This construction makes the act conformable to the general maritime law, and the owners by abandoning the ship and freight will be discharged from personal responsibility.

This was a libel on a bill of lading against the owners of the schooner Waldo.

Sewell & Howard, for libellant.

Mr. Groton, for respondent.

WARE, District Judge. This is a libel in personam founded on a bill of lading, against the master and owners of the schooner Waldo, and arising out of the same voyage as is described in the case just decided. [Case No. 17,050.] The libellant shipped on board the Waldo, Wm. C. Wyman, master, twenty-eight barrels of No. 1 Magdalen herring, and twenty barrels of potatoes, consigned to Capt. Merrill, the former master, and his assigns, for a market, he to have for freight half the profit for which the goods were sold, above the invoice price. At Key West no sales could be made, but on their arrival at Atakapas, six barrels were sold by a barter trade, for five barrels of molasses, the molasses being valued at twenty cents a gallon or six dollars a barrel. The rest were so much injured that they were unsalable at any price, and were brought back to Phipsburg, where they were found to be entirely worthless and thrown into the dock. The potatoes were wholly rotten, and the empty barrels sold at fifty-five cents each. The goods were carried on deck, and the potatoes were spoiled by exposure to wet and the frost. Magdalen herring is an article that has lately come into the market. They are dry salted, and when carried by sea are stowed with the bungs of the barrels down, or holes are bored in them, to drain off the

1 [Reported by Edward H. Davies, Esq.]

pickle; because unless they are kept dry they are spoiled in a short time. Some evidence was introduced to show that this kind of herring is of so perishable a nature, that it will not, under any circumstances, bear a sea-voyage into a warm latitude. One witness, Capt. Webb, says that in 1839 he carried 100 barrels from Bath to Martinique; that they were carefully and well secured under deck, and on his arrival they were all found to be entirely ruined and worthless; and that the same season there were several vessels at that place with these herring, and all, without a single exception, were spoiled; and he states that he had never known any of that kind of herring arrive at the West Indies in good condition. But these were all of the fares of 1839, and it appears from the testimony of their witness and also from that of Captain Bailey, who was examined for the libellant, that the fares of 1839 were badly cured, and although they looked well were all spoiled when brought in. Captain Bailey said that he had some of the fares of 1840 which were well cured, and were found to be in good order when they arrived at a market. The fish in this case were of the fares of 1840, and it appears, therefore, that although these herring are an article of an unusually perishable character, yet when well cured, as those of 1840 were, they will with proper care in stowage bear transportation into warm countries. But for this purpose great care is required in stowing them so that they shall not only be protected from wet externally, but also so that the liquor that is evolved from the fish may drain off and leave them entirely dry. The evidence in this case is, that being carried on deck, they were for several days exposed to the water breaking over the vessel, and there does not seem to be much reason for doubt that the fatal injury they received was from this cause. If they had been properly secured under deck they might have arrived at a market in a merchantable condition.

With respect to the herring which were sold by the master and the proceeds not accounted for, my opinion, for the reasons given in the other case, is that the owners were not responsible. In the capacity of consignee he was not the agent of the owners, but of the shipper. It is only in cases where it is the known usage of the trade, that the owners can be held for his default as consignee. As to the residue of the herring and the potatoes, the strong presumption from the evidence is, that the loss arose from their exposure on deck. They were shipped by what is called a clean bill of lading, that is, it contained no other exception to the master's liability, but the usual one of the dangers of the seas; and such a bill of lading imports that the goods are stowed under deck. Curt. Merch. Seam. pp. 212, 213. The Schooner Reeside [Case No. 11,-657]. If the master takes them on deck, he stands as insurer, and will not be pro-

tected by the exception of the dangers of the sea; at least, not unless he can show that they would have equally perished if they had been below deck. It would not be enough for him to show that, being a perishable article, they might have sustained the same injury; he must show that they would not have been exempted from it by being under deck. Whether in that case he would be protected, it is not necessary now to consider, as it is certain that if they had not been exposed to the frost and the wet upon deck they might have gone safely. The goods were shipped on an agreement that the master was to have, for freight, one-half the profits beyond the invoice price. This for the herring is $2.75 a barrel, to which is to be added eleven cents a barrel for inspection. This for twenty-two barrels, after deducting six which the master sold, is $62.92, and twenty barrels of potatoes at $1.06½ is $21.25. Total, $84.17.

The common law, as well as the civil law, holds the owners responsible for all the obligations of the master, contracted within the scope of his authority as master, to their full extent, whether they result from contract or tort. But, by the general maritime law of Europe, their responsibility for his obligations, arising out of his wrongful acts, is limited to the amount of their interest in the ship and freight. By abandoning these they exempt themselves from all personal liability. 3 Kent, Comm. (4th Ed.) p. 218. This principle of the general maritime law has never been received in this country as part of our customary law, but we have followed the common law of England, and hold the owners responsible for the full amount of any damage occasioned by the faults or negligence of the master or any of the crew. They are strictly held to all the severe liabilities of common carriers. But in this state, by statute in conformity with the principles of the general maritime law, their liability is restricted to their interest in the ship and freight. 'No ship-owner shall be answerable, beyond the amount of his interest in the ship and freight, for any embezzlement, loss, or destruction, by the master or mariners, of any goods or merchandise, or any property put on board of such ship or vessel, nor for any act, matter or thing, damage or forfeiture, done, occasioned, or incurred by said master or mariners, without the privity or knowledge of said owners.' Rev. St. c. 47, § 8. The statute limits the owner's responsibility 'for any embezzlement, loss, or destruction by the master or mariners, of any goods or merchandise.' The loss in this case was not occasioned immediately by any act of the master or mariners. The proximate cause of the loss was the violence of the seas. But it would not have happened in this way, but through the fault of the master in carrying the goods on deck. The reasonable construction of the statute, it appears to me, is to limit the own-

er's responsibility for losses which are occasioned by the fault or negligence of the master, as well as those which arise from direct and willful fraud. This construction of the statute brings it into harmony with the general maritime law of Europe, and is fairly within the policy and general intent of the act, though not, perhaps, within its very words.

If the decree which has just been pronounced should exhaust the whole value of the ship and freight, the respondents, by abandoning them, will be discharged from all personal responsibility. The damages in that case will not, I presume, absorb the whole fund; but if it should, the owners will be entitled to show the fact, and then no execution can be issued against them personally.